UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **BAKEER ABDULLAH ALI,** | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 03-989 (RMC) |
| **UNITED STATES PAROLE COMMISSION,** *et al.*, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Bakeer Abdullah Ali, f/k/a Ernest Giles, has spent most of his adult life in prison, ever since he was convicted of murder in 1977 at the age of 30. Each time he has been paroled, he has quickly violated the conditions of parole, had his parole revoked, and been returned to jail. He complains here about a revocation hearing conducted by the United States Parole Commission ("USPC") on March 3, 2003, at which he asserts his constitutional right to due process was violated because the Hearing Examiner curtailed his cross-examination of an adverse witness, relied upon that witness's testimony although she had effectively been impeached by counsel for Mr. Ali, and unlawfully relied on inaccurate and inconsistent information. A careful review of the hearing transcript and the complete record before the Court shows that Mr. Ali's rights have not been violated. The complaint will be dismissed.

### I. BACKGROUND FACTS

Mr. Ali began serving an 8-to-24 year sentence for Murder II while Armed and other crimes on November 30, 1977. He was first paroled in November 1987 and was in and out of jail until October 14, 1988, when he was released on parole with 4,773 days remaining to serve.

However, about a year later, on October 2, 1989, he received a 4-to-12 year consecutive sentence for Assault with a Deadly Weapon, which violated the terms of his parole. The new consecutive sentence was added to the 4,773 days remaining to serve. Thus, when the District of Columbia Board of Parole issued a Certificate of Parole in 1998, it required him to "remain under supervision . . . until March 16, 2014." Upon parole by the District in 1998, he was actually transferred to the custody of the United States Marshals Service ("USMS"), for service of a federal sentence of 41 months for Escape from Lorton. He was released by USMS on parole to the street in May 2001.

Barely out of jail, on May 28, 2001, Mr. Ali was arrested and charged with, *inter alia*, Kidnapping. In a Report of Alleged Violation of parole, the D.C. Court Services and Offender Supervision Agency ("CSOSA") notified the USPC that Mr. Ali had been arrested and that he "owe[d] 4,706 days" for the 1989 parole violation associated with the Assault with a Deadly Weapon conviction. USPC staff applied to the Board for a warrant and stated that Mr. Ali's sentence was 24 years, 10 months, and 20 days, and that his Termination of Supervision date was March 16, 2014. On June 15, 2001, USPC issued a warrant to the USMS to detain Mr. Ali, stating that he had been paroled on June 1, 1998, from the D.C. Department of Corrections with 5,767 days remaining to be served.

The Marshals lodged a detainer against Mr. Ali so that he would not be released on the new Kidnapping charge without going before the USPC for the alleged parole violation. Eventually, the Kidnapping and other charges were dropped by the U.S. Attorney on February 3, 2003. On February 5, 2003, Mr. Ali was turned over to the USPC on the violator warrant. The revocation hearing of which Mr. Ali complains here was held before Hearing Officer Rob Hayworth on March 3, 2003. At Mr. Hayworth's recommendation, USPC revoked Mr. Ali's parole on March

26, 2003, and sentenced him to 120 months (10 years) for violating his parole, with credit for time spent in D.C. Jail since May 28, 2001.

## II. THE REVOCATION HEARING

The transcript of the revocation hearing is in the record. Rob Hayworth was the Hearing Examiner. Mr. Ali was represented by Olinda Moyd from the D.C. Public Defender Service. Although more people had been subpoenaed to appear, only one witness other than Mr. Ali appeared and testified. That witness was Jacqueline Carr, an eyewitness to the charged Kidnapping.

At the beginning of the hearing, Mr. Hayworth explained:

> This is an administrative hearing. The rules that limit the admissibility of evidence that are applicable in a criminal trial do not apply in a parole revocation hearing. For example, any disputed charges will be resolved by what's called a preponderance of the evidence standard.
>
> Now, in applying that standard of proof, what that means is that we accept the evidence that as a whole is considered to be more credible and convincing than the evidence offered in opposition to it.

*Bakeer Abdul Ali v. Edward F. Reilly, Jr.*, Case No. 04-5178 (U.S. Parole Commission, March 13, 2003) at 4-5 (hereafter "Rev. Tr."). Immediately, however, Ms. Moyd and Mr. Ali raised an issue about Mr. Ali's full-term date. Mr. Ali insisted that his term of incarceration had already expired in January 2001. *Id.* at 12. He argued, "[M]y initial term is only 24 years. I have done 24 years is what I'm saying. There is no backup. When you do the whole sentence, there can't be any backup." *Id.* at 14-15. Most specifically, Ms. Moyd asserted that Mr. Ali's time was up, he was no longer on parole at the time of the alleged kidnapping, and the revocation hearing was therefore invalid. *Id.* at 16. Mr. Hayworth promised to make a note of the issue, which he did in his recommendation to the Commission, but explained that USPC gets its numbers from the Bureau of Prisons, which

performs all computations. *Id.* at 14. Based on the 1998 Parole Certificate, which listed March 16, 2014 as the full-term date, *id.* at 9, he proceeded with the hearing.

Ms. Moyd then pointed out that the Kidnapping and other charges had all been dismissed. Mr. Hayworth agreed but advised that "the Parole Commission makes their own findings of whether they think you're guilty of it or not, and that's why we're having this hearing today. If that is dismissed in court doesn't mean the Parole Board will dismiss it." *Id.* at 18.

Mr. Ali then recounted events from his point of view. He had been released by the USMS on a Friday, after completing his prison term for Escape. He met the Complainant on Sunday in Southeast Washington, D.C., and she offered to perform a sexual act for $10. The two went into an abandoned cottage on the grounds of St. Elizabeth's Hospital for that purpose. The Complainant then used the $10 to buy some crack. Mr. Ali encountered the same woman on May 28, 2003. This time, he gave her the money up front, she bought some crack, and smoked it immediately. As they headed toward the cottage, the Complainant said she needed more money. He laughed "and then she swinged [sic] on [him] . . . [t]wice and [he] was still laughing." *Id.* at 20-21. The woman then led the way into the cottage and went into one of the upstairs bedrooms. Before he even entered the room, Mr. Ali heard noises in the front hall and went part way down the stairs, where he ran into Hospital Security. *Id.* at 21. He was handcuffed and put into a car and later turned over to the police.

Jacqueline Carr, a Hospital employee, then gave a statement at the revocation hearing. She said she was leaving her office about noon on May 28, 2003, when she heard some noise. *Id.* at 25. As she got into her car, she heard it again. *Id.* She turned around "and I saw this gentleman right here snatch this lady up off the avenue and took her into . . . the house . . . that I was parked

behind." *Id.* The noise coming closer "made me turn around. And that's when he had his hand over her mouth. But I still heard her. She was screaming." *Id.* at 26. Ms. Carr returned to her office, where her supervisor called Security. *Id.* 28. They returned to the cottage and waited for Security and observed the arrest of Mr. Ali by Security.

Ms. Moyd then cross-examined Ms. Carr, relying on a statement Ms. Carr had given to an investigator to attempt to impeach her. In this regard, she asked:

- Do you remember stating to our investigator that when you saw the woman, she was carrying a grocery cart like people take their groceries home? And she had a bunch of junk in there. The cart that was left on the avenue? *Id.* at 40.

- On the day that you spoke with my investigator, you said that the guy was skinny build, he looked like he was in his 50's [sic]. He was wearing a blue windbreaker sweatpants, a black cloth jacket and no hat. [You] didn't pay attention to his shoes. [You] could tell from the car that he was wearing glasses, like reading glasses. *Id.* at 45.

- So do you remember that he had on a black cloth jacket or not? I mean, that's the statement that you gave. So do you remember whether you saw his jacket or whether you didn't see his jacket? *Id.* at 46.

Not satisfied with the witness's answers, Mr. Ali interrupted with his own questions:

ALI: Would it surprise you to know that I had on a blue denim Guess jean jacket, and that they were black, a nylon-type windbreaker [pants] with a yellow nylon stripe down the side? And the fact that this shirt you describe in there[1] with so [sic] particularity, a white (inaudible), she said, some kind of panel on it? [sic]

WITNESS: Uh-uh.

ALI: You gave a complete description of this thing here, but today you're saying something totally different.

WITNESS: Because what you had — you had on those blue

---

[1] "In there" presumably referred to the statement taken down by the investigator.

5

jeans.

>ALI: Regardless, I'm saying —
>
>WITNESS: Like you say, like I said, you had on those blue pants.
>
>ALI: I did not.
>
>WITNESS: And I know exactly —
>
>ALI: I can prove what I had on because I got —
>
>HAYWORTH: Mr. Ali, let's don't get into —
>
>MOYD: Well, he has the right to cross-examine —
>
>HAYWORTH: Of course, he does. He doesn't have the right to argue with her though.
>
>ALI: I'm not arguing; I can prove it.
>
>HAYWORTH: Okay, I've heard what you said and I heard what she said, so let's change the subject. Do you have any other questions you'd like to ask?
>
>MOYD: No further questions.

*Id.* 46-48. Ms. Moyd then argued about discrepancies in Ms. Carr's testimony concerning how close she was to the man and woman and the clothing allegedly worn by Mr. Ali on that day. *Id.* at 49-51.[2]

---

[2] Because it is critical to Mr. Ali's arguments here, the Court quotes Ms. Moyd's argument:

> The first discrepancy is regarding the distance of when she initially saw what happened. She testified here today that when she looked in her rearview mirror, that she saw a man and a woman in her rearview mirror. And she gave a description of what they were doing.
>
> She said they were close. I asked her to try to give a description. I said how far away. She said inches away. In the report that she gave, she said: When I first saw the man and the woman, I was about 20 feet away from them in my car. That's what she - that's what she said

She gave Mr. Hayworth a copy of Ms. Carr's statement taken by Ms. Moyd's investigator. Her legal argument was that Ms. Carr had had no contact with the Complainant and could "give no information about whether or not the complaining witness voluntarily was with Mr. Ali on the day in question," so that the evidence was simply insufficient to make any findings adverse to her client. *Id.* at 51. The Hearing Examiner then took a break and returned to pronounce his findings.

---

> in a sworn statement that she gave on July 27th, 2001, two months after the incident.
>
> She also gave different information here today about the description. She kept saying here today that he had on two pairs of pants. She initially testified that she couldn't remember what shirt he had on because she said that the woman was covering his shirt. That's not what she said in the report here.
>
> She clearly gave a description of the clothing. And I read that portion previously, where she stated that he . . . was wearing blue windbreaker sweatpants, a black cloth jacket and no hat. And she says: I didn't pay attention to his shoes. And she notes that he had on glasses.
>
> She also says in her report that when she stood there and saw him come down out of the house that he had on the same jacket. Now, this is the second time that she remembers here that he had on the jacket that she couldn't remember today. She says the jacket was unbuttoned, I could see his shirt. It was black and white, buttoned down, and had black and white flowers printed on it.
>
> Mr. Ali indicates that that does not match the clothing descriptions that are here at the facility which will give an official record of what he had on when he was taken into custody, totally different description. But the most important thing is that this woman had no contact with the complaining witness, had no conversation with her, and could give no information about whether or not the complaining witness voluntarily was with Mr. Ali on the day in question.

*Id.* at 49-51.

> Well, Mr. Ali, I'm going to tell you what my belief is after reading all this information and listening to the testimony. I believe you're guilty of assaulting that woman. And I believe you're guilty literally of kidnapping her, forcing her to accompany you into that cottage.
>
> I'm totally unconvinced that she was going of her own free will. I don't have enough information to make a finding that you attempted to rape her. . . . But I am convinced that you assaulted her and kidnapped her.

*Id.* at 54. When Ms. Moyd protested that kidnapping "requires that the person move someone from one place to another against their will" and no witness said that happened, Mr. Hayworth said that he was basing his findings "on the testimony of the eyewitness and what was seen. It does fit Mr. Ali's pattern of violence, particularly against women in the past." *Id.* at 54-55. Mr. Ali disagreed with the decision and complained that Mr. Hayworth had "been prejudiced. I've offered you, given you proof of what I was saying.[3] You didn't even let me finish." *Id.* at 58-59. Finally, Ms. Moyd argued that Mr. Ali had the right to confront his accuser and that the Complainant had not even appeared. *Id.* at 60; *see also id.* at 60 ("[Y]ou need the complaining witness here . . . ."). At that point, Mr. Hayworth said, "We're through. I don't want to discuss it any more." *Id.* He rejected a proffer of statements from the Complainant and the hearing ended. *Id.*

### III. PROCEDURAL HISTORY AND LEGAL STANDARDS

This case was remanded in part by the Court of Appeals "in light of subsequent decisions" holding that a D.C. prisoner may challenge USPC parole eligibility procedures under 42 U.S.C. § 1983. *Ali v. Reilly*, No. 04-5178, 2006 U.S. App. LEXIS 15587 (D.C. Cir. June 14, 2006). The Court of Appeals had earlier affirmed the dismissal of the claims against Ms. Olinda Moyd. *Ali*

---

[3] Mr. Ali had an MPD report on the clothing he had been wearing when brought into the D.C. Jail and required to put on a Jail jumpsuit.

*v. Reilly*, No. 04-5178, 2005 U.S. App. LEXIS 457 (D.C. Cir. Jan. 11, 2005).

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This procedural device is not a "disfavored legal shortcut" but a reasoned and careful way to resolve cases fairly and expeditiously. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). In determining whether a genuine issue of material fact exists, the Court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). To be "material" and "genuine," a factual dispute must be capable of affecting the substantive outcome of the case. *Anderson*, 477 U.S. at 247-48; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).

## IV. DISCUSSION

Mr. Ali pursues his complaint against USPC under 42 U.S.C. § 1983.[4] *Settles v. U.S. Parole Commission*, 429 F.3d 1098 (D.C. Cir. 2005), held that a suit under § 1983 will lie against individual members of the USPC when acting pursuant to the National Capital Revitalization and Self-Government Improvement Act of 1997 ("Revitalization Act"), Public Law No. 105-33, § 11231(a)(1), 111 Stat. 712, 745 (effective August 5, 1998); D.C. Code § 24-131. The Revitalization Act gives authority to the USPC to administer parole for D.C. Code offenders, in place of the D.C. Board of Parole. The reasoning is that the Commission itself is an arm of the federal government

---

[4] Although Mr. Ali also relies upon 42 U.S.C. § 1985, he offers no evidence or argument to support such a claim. A proper claim under § 1985 must allege: (1) the existence of a conspiracy; (2) for the purpose of depriving any person or class of persons of the equal protection of the laws; (3) motivated by some class-based, invidious, discriminatory animus; with (4) an act in furtherance of the conspiracy; (5) whereby a person is injured or deprived of a right or privilege. *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *Hobson v. Wilson*, 737 F.2d 1, 14 (D.C. Cir. 1984). No such allegations are made here.

and not subject to suit but the Commissioners are persons acting under color of D.C. law when administering D.C. parole and are thus subject to § 1983 in their official capacities. *Settles*, 429 F.3d at 303-05.

To prevail on his § 1983 claim, Mr. Ali must establish that government officials deprived him of the constitutional right to due process. A parolee has a Fifth Amendment liberty interest in maintaining his "conditional" freedom and therefore is entitled to due process prior to revocation. *See Ellis v. District of Columbia*, 84 F.3d 1413, 1420 (D.C. Cir.1996) (citing *Morrissey v. Brewer*, 408 U.S. 471 (1972)). As a general rule, that entitlement is limited to notice and an opportunity to be heard in a reasonably timely manner. *See id*. at 1421-24 (discussing *Morrissey* standards).

The alleged violations of Mr. Ali's due process rights at his 2003 revocation hearing involved curtailing his cross-examination of an adverse witness, relying upon that witness's testimony although she had been impeached by Ms. Moyd, and unlawfully relying on inaccurate and inconsistent information concerning Mr. Ali's penal history. These will be addressed in turn, mindful that the Court may not "repass on the credibility of reports and information received by the Board in making [parole] determinations." *Billiteri v. U.S. Bd. of Parole*, 541 F.2d 938, 944 (2d Cir. 1976) (quoting *Brest v. Ciccone*, 371 F.2d 981, 982-83 (8th Cir. 1967)). Rather, "[p]arole revocation violates due process [only] if the decision is 'either totally lacking in evidentiary support or . . . so irrational as to be fundamentally unfair.'" *Singletary v. Reilly*, 452 F.3d 868, 872 (D.C. Cir. 2006) (quoting *Duckett v. Quick*, 282 F.3d 844, 847 (D.C. Cir. 2002)).

**A. Curtailment of Cross-Examination**

Hearing Examiner Hayworth ended Mr. Ali's questioning of Ms. Carr when he argued with her concerning the clothing he had been wearing on May 28, 2003. The Court can find no due

10

process violation. Although Mr. Ali had a right to cross-examine adverse witnesses, he did not have a right to argue with them. More importantly, the subject matter on which he wanted to examine the witness was not critical. There was no question of identification at issue. Mr. Ali had already acknowledged his presence at St. Elizabeth's on May 28 and his involvement with the Complainant. The issue was whether or not their involvement was consensual, and Mr. Ali's clothing was relevant only to the credibility of Ms. Carr's recollections. Mr. Hayworth obviously understood the disagreement on clothing — Ms. Moyd argued it quite extensively — but chose to credit Ms. Carr's testimony that the Complainant was carried into the cottage by Mr. Ali against her will.

### B. Reliance On Ms. Carr's Testimony

Mr. Hayworth made a credibility determination that he believed Ms. Carr and did not believe Mr. Ali. In other words, after hearing from both of them, he was convinced that Mr. Ali had forced the Complainant into an empty building at St. Elizabeth's and that she was unwilling. While Ms. Moyd used an earlier statement from Ms. Carr to assail her recollection of details, such as Mr. Ali's clothing on the day in question, she had nothing to impeach her basic testimony that Mr. Ali forcibly carried the Complainant into the building as she screamed in protest.

The evaluation of a witness's credibility is a complex process, reliant on demeanor, body language, consistency of testimony, ability to withstand cross examination, and other factors. It is often that a witness might be believed for some of her testimony but not for all. There is a specific federal jury instruction on the point. Mr. Hayworth could well have decided that Ms. Carr's testimony concerning Mr. Ali's clothing was a mistake in recollection but that her certainty on the more critical point of consent by the Complainant was more persuasive than Mr. Ali's version of the events. There is sufficient record evidence of her testimony and his reasons for crediting her that no due process violation of Mr. Ali's rights can be fashioned.

11

This conclusion is buttressed by the arguments advanced by Ms. Moyd in Mr. Ali's defense. While she recounted perceived flaws in Ms. Carr's testimony in comparison to her earlier statement, her real argument was legal and not factual. Ms. Moyd noted that "the most important thing is that [Ms. Carr] had no contact with the complaining witness . . . and could give no information about whether or not the complaining witness voluntarily was with Mr. Ali." Rev. Tr. at 51. When Mr. Hayworth explained his recommendation to revoke parole, Ms. Moyd vigorously argued that Mr. Hayworth could not make a finding on the Kidnapping charge without testimony from the Complainant, without any further argument or allusion to Ms. Carr. She protested, "I just don't understand how you can make a finding on kidnapping," and "I think there's not enough evidence. . . . [W]e're today to make a finding based on the evidence." *Id.* at 57. Mr. Hayworth responded that Ms. Moyd was Mr. Ali's "advocate and you're trying your best to defend him. But I disagree with you, and that's my final decision on that." *Id.* at 58. Ms. Moyd retorted, "But if you don't think that you need the complaining witness here to make a determination about an offense like — ," to which Mr. Hayworth replied, "No, I definitely don't." *Id.* at 58. When Ms. Moyd and Mr. Ali continued to press the point, Mr. Hayworth concluded, "We're through. I don't want to discuss it any more" and "I can see that it's going nowhere except to continue to repeat myself." *Id.* at 60. He finally said, "No. No. The hearing is over." *Id.*

The alleged discrepancies in Ms. Carr's testimony concerning clothing were irrelevant because Mr. Ali admitted that he was present and that he encountered the Complainant with an intention to commit a sexual act in the abandoned cottage. The Court can find no constitutional violation in Mr. Hayworth's reliance on Ms. Carr's testimony concerning the critical issue of voluntariness.

12

### C. Inaccurate and Inconsistent Information

Mr. Ali complains that the calculations used by the USPC were outdated and that "the sentence computation staff personnel . . . unilaterally, illegally and in an ultra vires manner, failed to keep and compile accurate record information concerning [his] time served but have . . . increased [his] total sentence structure by seeking and striving to have [him] . . . [incarcerated] until the year 2012." Am. Compl. at 11. It is certainly true that USPC records contained differing release dates for Mr. Ali: CSOSA said that he owed 4,706 days; USPC staff said that his sentence was 24 years, 10 months, and 20 days; and the USPC arrest warrant said that he had 5,767 days remaining to serve. Mr. Ali insists that these are all wrong, that he has served the entirety of his 8-to-24 year sentence for Murder II while Armed, and that the USPC has violated his rights by unilaterally extending his sentence.

Mr. Ali appears to concentrate his attention solely on his 1977 murder conviction and to overlook the *consecutive* sentence of 4-to-12 years for assault that was imposed in 1989. Mr. Ali's sentencing history is explained in the Declaration of Augustus Faller, who works for the Federal Bureau of Prisons and performs sentence computations for felons convicted in D.C. Superior Court. Faller Decl. ¶ 1. Mr. Ali was first sentenced to 8-to-24 years for murder on November 30, 1977. He escaped on April 1, 1984, and was returned to custody on April 3, 1984, for two days inoperative time. On September 17, 1984, he received a three-day consecutive sentence for Prison Breach. Faller Decl. ¶ 3.

He again escaped on December 9, 1987, and was returned to custody on December 12, 1987, for three days of inoperative time. On July 27, 1988, he received a 3-to-9 month consecutive sentence for Prison Breach. He was released on Parole on October 14, 1988, with 4,773 days remaining. *Id.* ¶ 4.

13

His Parole was revoked on February 14, 1989, with 4,773 days remaining to serve. *See* D.C. Code ¶ 24-206 (providing that a prisoner gets no credit for time on parole).  On October 2, 1989, Mr. Ali was sentenced to 4-to-12 years for Assault with a Deadly Weapon, Attempted Kidnapping and Theft 3, to be served consecutively.  He escaped on March 7, 1996, and returned to custody on May 29, 1996, for 83 days of inoperative time.  *Id.* ¶ 5.  He was released on Parole on June 1, 1998, with 5,843 days remaining to serve.  *Id.*

Mr. Ali was then arrested on May 29, 2001, and charged with Kidnapping.  The USPC issued a Parole Violation Warrant, which was placed as a detainer on June 15, 2001.  The warrant was executed on February 5, 2003, when the Kidnapping charges were dropped.  Mr. Ali was given 600 days of D.C. Jail credit toward his parole violation term from June 15, 2001, through February 4, 2003.  *See* D.C. Code ¶ 24-221.03(b) (time served on a charge that is dropped is credited toward any charge for which a warrant or detainer was placed).

Mr. Ali's parole was revoked on February 5, 2003, with 5,843 days remaining to serve, minus the 600 days of D.C. Jail credit.  USPC has denied him re-parole and ordered that he serve his sentence to the expiration of its maximum term, *i.e.*, March 11, 2012, which takes into account 1,920 days of D.C. Institution Good Time credit.  *Id.* ¶ 6.

Obviously, Hearing Officer Haywood and the USPC did not have the benefit of Mr. Faller's detailed Declaration.  The record at that time indicated that Mr. Ali's full-term date was March 16, 2014.  While this release date has been reduced by good time credit, Mr. Haywood's reliance upon it did not violate Mr. Ali's rights because Mr. Ali was clearly still under parole supervision, regardless of his sentence expiration date, and the USPC had full authority to adjudicate the alleged parole violation.

Further, Mr. Ali was afforded all the process that was his due at the revocation hearing. The USPC was required to base its findings on only a preponderance of the evidence. 28 C.F.R. § 2.19(c); *id.* § 2.89 (incorporating § 2.19 as applicable to D.C. offenders). *See also Ellis v. District of Columbia*, 84 F.3d 1413, 1423 (D.C. Cir. 1996). Mr. Ali was represented by counsel, Public Defender Olinda Moyd. Mr. Ali was permitted to make a full statement of his version of the facts and an eyewitness testified to what she had seen. Both Mr. Ali's counsel and he, himself, questioned the eyewitness and attacked her credibility. He acknowledged, when asked if he had any further witnesses, that he "never requested any." Rev. Tr. at 6. Ms. Moyd made a vociferous factual and legal argument at the end of the hearing. In the end, the Hearing Officer made a credibility determination and believed the eyewitness's account and not Mr. Ali's. There is certainly sufficient evidence in the record to sustain his conclusion and no evidence to support Mr. Ali's arguments that Mr. Haywood was biased or interfered with Mr. Ali's rights.

The revocation hearing was also timely. Mr. Ali complains that he was held for 22 months after his May 2001 arrest before he received a hearing. However, he was in custody on other criminal charges at that time. The USPC warrant was not executed until February 5, 2003, and he received a final revocation hearing on March 13, 2003. This was well within the 65 days permitted by the USPC regulations. *See* 28 C.F.R. § 2.101(i). The clearly established law is that it is the execution of the parole violation warrant which triggers the right to a revocation hearing. *Morrissey*, 408 U.S. at 485; *Moody v. Daggett*, 429 U.S. 78 (1976).

Mr. Ali's complaint that the USPC failed to apply D.C. regulations to his revocation hearing misapprehends the state of the law. The Revitalization Act requires the USPC to "assume the jurisdiction and authority of the Board of Parole of the District of Columbia to grant and deny parole, and to impose conditions upon an order of parole, in the case of any imprisoned felon who

15

is eligible for parole or reparole under the District of Columbia Code." 111 Stat. 745. The Act grants the USPC "exclusive authority to amend or supplement any regulation interpreting or implementing the parole laws of the District of Columbia with respect to felons . . . ." *Id*. USPC has amended and supplemented D.C. parole regulations; they are codified at 28 C.F.R. § 2.70 *et seq*. It is these regulations that properly were applied to Mr. Ali's case.

## V. CONCLUSION

Finding no violation of Mr. Ali's rights under § 1983, the Court will grant the Defendants' motion for summary judgment. A memorializing order accompanies this memorandum opinion.

Date: March 2, 2007                                  /s/
                                                    ROSEMARY M. COLLYER
                                                    United States District Judge